IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs March 3, 2015

**ALVERTIS BOYD v. STATE OF TENNESSEE**

**Appeal from the Criminal Court for Shelby County**
**No. 08-01138     Chris Craft, Judge**

---

**No. W2014-00404-CCA-R3-PC  - Filed April 21, 2015**

---

The Petitioner, Alvertis Boyd, was convicted of aggravated robbery, and the trial court sentenced him as a repeat violent offender to life imprisonment. This Court affirmed his conviction and sentence on appeal. *State v. Alvertis Boyd*, No. W2010-01513-CCA-R3-CD, 2011 WL 2586811, at *1 (Tenn. Crim. App., at Jackson, July 1, 2011), *perm. app. denied* (Tenn. Nov. 16, 2011). The Petitioner filed a petition seeking post-conviction relief, and, after a hearing, the post-conviction court denied the Petitioner relief. After review, we affirm the post-conviction court's judgment.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the Court, in which ROBERT H. MONTGOMERY, JR., and TIMOTHY L. EASTER, JJ., joined.

Constance Wooden Alexander, Memphis, Tennessee, for the appellant, Alvertis Boyd.

Herbert H. Slatery III, Attorney General and Reporter; Michael M. Stahl, Assistant Attorney General; Amy P. Weirich, District Attorney General; and Lora Fowler, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**
**I. Facts**
**A. Trial**

A Shelby County jury convicted the Petitioner of aggravated robbery. On direct appeal, this Court summarized the facts presented at trial as follows:

On July 30, 2007, the [Petitioner] entered a Circle K gas station in

Memphis, Tennessee sometime after 10:00 p.m. The [Petitioner] walked behind the counter where the victim, a Circle K employee, was standing and took a sandwich out of the "freezer box" and a Pepsi out of the "cooler box" before walking to the counter. Once at the counter, the [Petitioner] "just stood there" and was "fidgety." The [Petitioner] said, "don't be scared" and told the victim to "pay it out." The victim understood the [Petitioner]'s statement to mean that he wanted her to open the cash register. The victim, believing that the [Petitioner] was joking, hesitated, and the [Petitioner] "raised his shirt up" and showed the victim a "small .380" handgun in his waistband. The victim opened the cash register and stepped back as the [Petitioner] reached toward the register. The [Petitioner] told the victim to lift the pan in the register, but the victim did not comply. The [Petitioner] lifted the pan, took $60 or $70 from the register, and started to leave. As he was leaving, the [Petitioner] knocked the sandwich and Pepsi off the counter. Realizing that he had left his cellular telephone and keys on the counter, the [Petitioner] returned and retrieved his belongings. As he was leaving the second time, he bumped into a customer, Justin Scarbrough, who was entering the store. The victim told Mr. Scarbrough that she had been robbed, and Mr. Scarbrough ran outside and saw the [Petitioner] jogging north down the "Highland Strip."

During the investigation of the robbery, the victim and Mr. Scarbrough were able to identify the [Petitioner] from a photographic display. At trial, the victim admitted that she was only four feet and nine inches tall but explained that she could see the weapon in the [Petitioner]'s waistband over the counter because the floor behind the counter was higher than the floor in the store. The victim also testified that she opened the cash register because she saw that the [Petitioner] had a weapon. She said that she was "intimidated" when she saw the [Petitioner]'s weapon.

The [Petitioner] testified that he went to the store with the intention of robbing the victim. He said he went inside, grabbed a drink and a sandwich, and walked to the counter. Once at the counter, the victim told the [Petitioner] the price of the items he had selected. The [Petitioner] showed the victim how much money he had, approximately three dollars, and the victim told him that he only had enough money for the sandwich. The victim opened the register, and the [Petitioner] reached over the counter and grabbed the money from the register. The [Petitioner] testified that he never showed the victim a weapon and that he did not have a weapon. The [Petitioner] admitted that he had been previously convicted of aggravated robbery and misdemeanor theft of property.

-2-

Based upon this evidence, the jury convicted the Petitioner, and the trial court sentenced him to life in prison. The conviction and sentence were affirmed on appeal. *See Boyd*, 2011 WL 2586811, at *1.

## B. Post-Conviction Hearing

At the post-conviction hearing, the parties presented the following evidence: the Petitioner testified that he was currently serving a life sentence for his 2010 aggravated robbery conviction. He stated that there was a surveillance video tape recording of the Circle K robbery for which he was convicted. The Petitioner told his trial attorney ("Counsel") about the surveillance video, alleging that the video contained exculpatory evidence and that the State had "intentionally unlawfully withheld, [or] destroyed" the video recording. He asked Counsel to notify the trial court in an attempt to obtain the video recording. He recalled that, thereafter, Counsel came to see him with two video tapes, but neither were the surveillance footage of the robbery.

The Petitioner testified that the video surveillance footage would have confirmed his trial testimony that he reached over the counter and grabbed money from the register but did not use a gun. The Petitioner stated that he wanted Counsel to obtain the video in order to show at trial that he did not commit an aggravated robbery. He admitted that he committed a "theft" by "snatch[ing]" money out of the convenience store cash register but maintained that he did not use a weapon to do so. He said that he had watched the video surveillance footage when he turned himself in at the police station on August 2, 2007. Detective Beasley and Detective Goodes showed the video to him during questioning, and then the video was never produced during discovery or at trial. The Petitioner stated that one of the detectives testified at trial that the surveillance video was "lost." The Petitioner said that he discussed the surveillance video with Counsel "on several occasions" but that she never produced the video. The Petitioner stated that Counsel "bl[e]w [him] off" when he asked about the video. He said that Counsel failed to file any pretrial motions relevant to the surveillance video.

On cross-examination, the Petitioner testified that the two videos that Counsel brought to him were related to other cases against him. The Petitioner stated that, in addition to the absence of a weapon, the surveillance video footage would have also shown that the counter blocked the store clerk's view of his waistband where he allegedly had the gun. He agreed that Counsel cross-examined the store clerk about her height and the height of the counter and the store clerk maintained that she saw the gun. The Petitioner further agreed that Counsel cross-examined the detective about the lost video and argued to the jury that there was no evidence to show the Petitioner had a gun.

The Petitioner testified that, during police questioning when he viewed the video, he pointed out to the detectives that the surveillance footage did not show a gun. He agreed that this observation was not included in his statement to the detectives. The Petitioner said that he also told the detectives that he was on medication at the time of the interview and confirmed that this information was also not included in his statement.

Counsel testified that she was appointed to represent the Petitioner on March 20, 2008. She explained that the Petitioner was indicted on three different cases with two aggravated robbery charges and one robbery charge. Counsel acknowledged that the police had retrieved the Circle K surveillance video but stated that the video "was not around by the time we got into court." Counsel noted that, in this case, the Petitioner had given a statement, and there were also identifications of the Petitioner. Her research of case law on the issue of the lost video recording addressed circumstances where a video was lost but the defendant denied involvement or identification, unlike in the present case. Thus, she did not file a pretrial motion addressing the lost surveillance video.

Counsel testified that, at trial during direct examination of the Petitioner, he testified that he never had a gun. Counsel agreed that she did not question the detective extensively about the surveillance video because she did not want to give the detective the opportunity to confirm the store clerk's account of the robbery. Counsel confirmed that during closing argument she raised the issue of the lost surveillance video.

On cross-examination, Counsel testified that she did not file a motion regarding the lost video because she did not see any bad faith on the part of the State. Further, she believed the motion would be denied based upon the other evidence against the Petitioner.

After hearing the evidence, the post-conviction court issued an order denying relief. It is from this judgment that the Petitioner now appeals.

## II. Analysis

On appeal, the Petitioner contends that the trial court improperly denied his petition seeking post conviction relief. He maintains on appeal that Counsel was ineffective because she failed to file a motion to dismiss when she learned the surveillance video was missing. The State responds that the Petitioner has not adequately demonstrated that he is entitled to relief. We agree with the State.

In order to obtain post-conviction relief, a petitioner must show that his or her conviction or sentence is void or voidable because of the abridgment of a constitutional right. T.C.A. § 40-30-103 (2014). The petitioner bears the burden of proving factual allegations

in the petition for post-conviction relief by clear and convincing evidence. T.C.A. § 40-30-110(f) (2014). Upon review, this Court will not re-weigh or re-evaluate the evidence below; all questions concerning the credibility of witnesses, the weight and value to be given their testimony, and the factual issues raised by the evidence are to be resolved by the trial judge, not the appellate courts. *Momon v. State*, 18 S.W.3d 152, 156 (Tenn. 1999) (citing *Henley v. State*, 960 S.W.2d 572, 578-79 (Tenn. 1997)). A post-conviction court's factual findings are subject to a *de novo* review by this Court; however, we must accord these factual findings a presumption of correctness, which can be overcome only when a preponderance of the evidence is contrary to the post-conviction court's factual findings. *Fields v. State*, 40 S.W.3d 450, 456-57 (Tenn. 2001). A post-conviction court's conclusions of law are subject to a purely *de novo* review by this Court, with no presumption of correctness. *Id.* at 457.

The right of a criminally accused to representation is guaranteed by both the Sixth Amendment to the United States Constitution and article I, section 9 of the Tennessee Constitution. *State v. White*, 114 S.W.3d 469, 475 (Tenn. 2003); *State v. Burns*, 6 S.W.3d 453, 461 (Tenn. 1999); *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975). The following two-prong test directs a court's evaluation of a claim for ineffectiveness:

> First, the [petitioner] must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the [petitioner] by the Sixth Amendment. Second, the [petitioner] must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the [petitioner] of a fair trial, a trial whose result is reliable. Unless a [petitioner] makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable.

*Strickland v. Washington*, 466 U.S. 668, 687 (1984); *State v. Melson*, 772 S.W.2d 417, 419 (Tenn. 1989).

In reviewing a claim of ineffective assistance of counsel, this Court must determine whether the advice given or services rendered by the attorney are within the range of competence demanded of attorneys in criminal cases. *Baxter*, 523 S.W.2d at 936. To prevail on a claim of ineffective assistance of counsel, a petitioner must show that "counsel's representation fell below an objective standard of reasonableness." *House v. State*, 44 S.W.3d 508, 515 (Tenn. 2001) (citing *Strickland*, 466 U.S. at 688).

When evaluating an ineffective assistance of counsel claim, the reviewing court should judge the attorney's performance within the context of the case as a whole, taking into

account all relevant circumstances. *Strickland*, 466 U.S. at 690; *State v. Mitchell*, 753 S.W.2d 148, 149 (Tenn. Crim. App. 1988). The reviewing court must evaluate the questionable conduct from the attorney's perspective at the time. *Strickland*, 466 U.S. at 690; *Hellard v. State*, 629 S.W.2d 4, 9 (Tenn. 1982). In doing so, the reviewing court must be highly deferential and "should indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Burns*, 6 S.W.3d at 462. Finally, we note that a defendant in a criminal case is not entitled to perfect representation, only constitutionally adequate representation. *Denton v. State*, 945 S.W.2d 793, 796 (Tenn. Crim. App. 1996). In other words, "in considering claims of ineffective assistance of counsel, 'we address not what is prudent or appropriate, but only what is constitutionally compelled.'" *Burger v. Kemp*, 483 U.S. 776, 794 (1987) (quoting *United States v. Cronic*, 466 U.S. 648, 665 n.38 (1984)). Counsel should not be deemed to have been ineffective merely because a different procedure or strategy might have produced a different result. *Williams v. State*, 599 S.W.2d 276, 279-80 (Tenn. Crim. App. 1980). "The fact that a particular strategy or tactic failed or hurt the defense does not, standing alone, establish unreasonable representation. However, deference to matters of strategy and tactical choices applies only if the choices are informed ones based upon adequate preparation." *House*, 44 S.W.3d at 515 (quoting *Goad v. State*, 938 S.W.2d 363, 369 (Tenn. 1996)).

If the petitioner shows that counsel's representation fell below a reasonable standard, then the petitioner must satisfy the prejudice prong of the *Strickland* test by demonstrating "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694; *Nichols v. State*, 90 S.W.3d 576, 587 (Tenn. 2002). This reasonable probability must be "sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694; *Harris v. State*, 875 S.W.2d 662, 665 (Tenn. 1994).

In its order denying relief, the post-conviction court found:

> As to the missing video, at trial Sergeant James Taylor testified to the jury that
>
> > on July 31st I went to the Circle K in an attempt to get a video of the robbery. They were unable to download the video on the 30th when the robbery occurred, so on August 1st we had an MPD squad car go to the business and get the video. The video was subsequently picked up by myself. We have an off-site that we work - - we don't work here at 201 Poplar [the Criminal Justice Center], we work at another office. And between here and the past couple of months we have misplaced the original robbery video.

(Trial Record, p. 74). The petitioner testified at the hearing on this petition that he watched the video on August 2nd with Detectives Beasley and Goodes while giving his written statement, and the video showed that he did not use a gun when he robbed the victim. He never mentioned ever viewing the video during his testimony at trial, however, or that it would have proved his innocence, and did not call either of the officers with whom he supposedly watched the video at the hearing on this petition. The written confession that he gave never mentioned the viewing of a video, and he testified at the hearing that when he gave his statement he told them that the video shows he didn't have a gun, but the police left that out of the statement. The victim testified at trial that the petitioner "raised his shirt up" and showed the victim a "small .380" handgun in his waistband. The victim then opened the cash register and the petitioner reached in and took possession of the money. This court finds that the petitioner has not shown by clear and convincing evidence that this missing video would have been able to show that the petitioner was not armed with a gun, since the victim stated that he only pulled up his shirt.

. . . .

Our Tennessee Supreme Court in *State v. Merriman*, 410 S.W.3d 779, 785-86 (Tenn. 2013), held as follows:

> If the trial court finds that the State failed in its duty to preserve the evidence, the trial court must consider the following factors to determine the consequences of that failure:
>
> > (1) [t]he degree of negligence involved; (2) [t]he significance of the destroyed evidence, considered in light of the probative value and reliability of secondary or substitute evidence that remains available; and (3) [t]he sufficiency of the other evidence used at trial to support the conviction. *Ferguson*, 2 S.W.3d at 917 (footnote omitted). The trial court must balance these factors to determine whether a trial conducted without the missing or destroyed evidence would be fundamentally fair. *Id*. If the trial court concludes that a trial would be fundamentally unfair without the missing evidence, the trial court may then impose an appropriate remedy to protect the defendant's right to a fair trial, including, but not limited to, dismissing the charges or providing a jury instruction. *Id*.

-7-

In considering these three factors, this court finds as to factor one that no proof of how the video was lost was put on at the hearing on this petition, so this court cannot determine the degree of negligence involved. As to factors two and three, there was a very credible victim who testified at trial that when the petitioner approached her, she at first thought he was joking.

A. And so I kind of hesitated and then he raised his shirt up to show me his gun.

Q. Where was the gun?

A. It's like in the front of his pants, you know.

Q. Once you saw the gun what did you think was going on?

A. I was actually getting robbed. And so I pushed the button and [the drawer of the register] popped open.

Q. So you pushed the button after you saw the gun?

A. Uh-huh.

(Trial Record, p. 17). She also testified that she told the first officer on the scene about the gun, she told the detective who took her statement about the gun and when she identified the petitioner in a photo lineup (Exhibit 2 at trial), she wrote on it "Came to the register and demanded money; lifted up his shirt and showed me a small handgun." She also testified that her brother had three guns, and that for this reason she recognized the grip the petitioner showed her as that of a .380 caliber. She also testified that the reason she cooperated was because she was intimidated when he pulled up his shirt. This court finds that if I had been asked to give T.P.I. - Crim. 42.23 at our charging conference at the end of the trial (Trial Record, pp. 97-103), after analyzing the *Ferguson* factors this court would not have given that pattern instruction, as no proof was put on at trial that the video would have been exculpatory. The petitioner testified at trial that he had no gun, but he did not testify to the jury that he ever watched a video with anyone, or mention that it showed he had no gun. He admitted at the hearing on this petition that his trial attorney did argue to the jury in closing that because the video was missing the State had failed to show he had a gun, but there was no proof at trial indicating the video was

exculpatory. (Transcript of the Hearing, p. 49.) This was only asserted on the day of the hearing by the petitioner after filing a *pro se* amendment at the last minute.

This court also finds that the petitioner's trial, conducted without the missing video, was not fundamentally unfair. The petitioner's testimony at the hearing that he watched the video with the detectives and that it clearly showed that he had no gun was simply not credible. He put on no proof other than his own unsupported testimony, which was not bolstered by any previous testimony at trial or indication in his confession that he had ever watched the video, or that it was exculpatory. As this court finds the allegations regarding the missing video . . . without merit, this court also finds that the allegation regarding the failure to preserve these issues for appeal also is without merit.

We conclude that the post-conviction court's decision was supported by the evidence presented at the hearing. With regard to the surveillance video, the detective testified at the trial that he retrieved the surveillance video from the Circle K and it was thereafter lost. The Petitioner contends that the video was exculpatory because it would have shown that he did not have a weapon when he robbed the victim. As the post-conviction court noted, the Petitioner's testimony that the surveillance video showed that he was unarmed is "unsupported." Counsel testified that she did not believe she had a basis to support a motion to dismiss based upon the lost video. Counsel testified that two eyewitnesses identified the Petitioner as the robber and the Petitioner admitted that he robbed the victim. The Petitioner testified at trial that he was unarmed when he robbed the victim. Further, Counsel cross-examined the detective about the lost surveillance video and raised this issue before the jury in closing argument. Therefore, the evidence at the hearing did not support the Petitioner's theory that Counsel was ineffective and that, but for Counsel's error, the fact finder would have had reasonable doubt regarding the Petitioner's guilt. *See Strickland*, 466 U.S. at 694-5.

This Court has previously held that the evidence was sufficient to support the Petitioner's convictions, and there is no indication that the trial was fundamentally unfair. *See Boyd*, 2011 WL 2586811, at *1. Thus, we conclude that the Petitioner failed to show that Counsel's services fell outside the range of competence normally required of attorneys in criminal trials. *See Baxter*, 523 S.W.2d at 936. Having failed to show the first prong of the *Strickland* standard, the Petitioner has not met his burden of showing that he is entitled to post-conviction relief based upon Counsel's performance. *Id*. He is not entitled to relief on this issue.

## II. Conclusion

After a thorough review of the record and relevant authorities, we conclude that the

post-conviction court properly denied post-conviction relief.  Accordingly, we affirm the judgment of the post-conviction court.


_____
ROBERT W. WEDEMEYER, JUDGE